**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION**

| | | |
|---|---|---|
| T.Y., a Minor, by his parents and next friends A.Y. and J.Y., and A.Y. and J.Y., as Individuals, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 3:22- |
| | ) | |
| SOUTH GIBSON SCHOOL CORPORATION, SOUTH GIBSON SCHOOL CORPORATION BOARD OF TRUSTEES, S.W., K.W., and C.W., a Minor | ) ) ) ) ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| Defendants. | ) | |

<u>**COMPLAINT FOR DAMAGES**</u>

NOW COMES Plaintiffs, by and through their counsel, and for their Complaint allege as follows:

**PRELIMINARY STATEMENT**

Plaintiffs A.Y. and J.Y. bring this action seeking redress for harms suffered by their disabled son, Plaintiff T.Y., who was subjected to discrimination, bullying, and harassment as a result of Defendants' intentional, knowing, deliberately indifferent, reckless and/or negligent acts and omissions. Defendants South Gibson County School Corporation and South Gibson School Corporation Board of Trustees have a policy, custom, or practice of not addressing student-on-student harassment in their schools, particularly when the victims are students with disabilities, by failing to prevent or stop it from occurring even in the face of actual knowledge that it is occurring. Specifically, they created, fostered, or permitted a hostile environment to exist in T.Y.'s school that deprived him of educational opportunities and benefits on the basis of his disability. At the

same time, after years of tormenting T.Y. and flourishing in the hostile environment created by school systems, Defendant C.W.'s bullying culminated in a vicious attack on T.Y. causing him serious personal injury and emotional trauma. Despite changing schools within the South Gibson School Corporation's district, the bullying, harassment, persecution, and discrimination of T.Y. has persisted.  T.Y. has been forced to abandon the public school system altogether and resort to home schooling as a result of the Defendants actions and inactions.

## PARTIES

1.      Plaintiff T.Y. is a 14-year old boy who resides with his parents (Plaintiffs A.Y. and J.Y.) in Haubstadt, Indiana. T.Y. has a disability which adversely affects his educational performance and is eligible for special education and related services due to his autism spectrum disorder, emotional disabilities, and other health impairments. T.Y. is a "child with a disability" as that term is defined by applicable federal law, including but not limited to 20 U.S.C. § 1401(3)(A); 34 CFR § 300.8.3 He has been diagnosed with depression, Attention Deficit Hyperactivity Disorder (ADHD), autism, anxiety, and Obsessive-Compulsive Disorder (OCD), among other conditions, and takes prescription medication to manage his symptoms. As T.Y.'s parents, A.Y. and J.Y. are responsible for T.Y.'s medical expenses.

2.      T.Y. attended public school and at relevant times attended schools owned, operated, maintained, staffed, and funded by Defendants South Gibson School Corporation (the "District") and South Gibson School Corporation Board of Trustees (the "Board"; together with the District, the "School"[1]). One of the school's operated by the School is Haubstadt Community School ("Haubstadt") located at 158 E 1025 S., Haubstadt, Indiana. The School also operates Gibson

---

[1] School may be used in singular form in this Complaint but shall be interpreted to reference the District and Board, jointly and severally.

Southern High School ("Gibson Southern") located at 3499 W 800 South, Fort Branch, Indiana 47648.

3.     Because of his disability, T.Y. receives special education and related services through the School and its schools.

4.     The District is an Indiana public school corporation which receives federal financial assistance. Its principal office is in Gibson County, Indiana.

5.     The Board is the governing body of the District. According to its Policy 0122, the Board has control of the District's facilities, programs, employees, and students.

6.     Defendant C.W. is a 15 year old boy who resides with his parents, Defendants S.W. and K.W., in  their custody, in Gibson County, Indiana.

## DISTRICT POLICIES

7.     The District's policy 1662 provides, in pertinent part:

It is the policy of the Board of School Trustees to maintain an . . . environment that is free from all forms of unlawful harassment . . . occurring in the Corporation's employment opportunities, programs, and/or activities . . . affecting the Corporation environment (hereinafter referred to collectively as "unlawful harassment") . . . . All students, administrators, teachers, staff, and all other school personnel share responsibility for avoiding, discouraging, and reporting any form of unlawful harassment . . . affecting the Corporation environment.

The Board will vigorously enforce its prohibition against unlawful harassment . . . which is based on . . . disability . . . or . . . classes protected by Federal and/or State civil rights laws (hereinafter referred to as "Protected Classes"), and encourages those within the Corporation community as well as third parties who feel aggrieved to seek assistance to rectify such problems . . . .

All Corporation employees, including administrators, professional staff and support staff, shall report any incident of alleged unlawful harassment . . . occurring in the Corporation's employment opportunities, programs and/or activities . . . affecting the Corporation environment that the employee observes or which is reported to the employee.

The Board will investigate all allegations of unlawful harassment . . . occurring in the Corporation's employment opportunities, programs and/or activities . . . affecting the Corporation environment and, in those cases where unlawful harassment is substantiated, the Board will take immediate steps to end the harassment, prevent its recurrence, and remedy its effects . . . .

8.    District policy 1662 contains the following definitions:

**Bullying**[.] Bullying rises to the level of unlawful harassment . . . when one (1) or more persons systematically and chronically inflict physical hurt or psychological distress on one (1) or more students with the intent to harass, ridicule, humiliate, intimidate or harm that/those student(s), and that bullying is based upon sex, race, color, national origin, religion, or disability, that is, characteristics that are protected by Federal civil rights laws. It is defined as any unwanted and repeated written, verbal, or physical behavior, including any threatening, insulting, or dehumanizing gesture, by an adult or student, that is severe or pervasive enough to create an intimidating, hostile, or offensive educational environment; cause discomfort or humiliation; or unreasonably interfere with the individual's school performance or participation; and may involve: [a.] teasing; [b.] threats; [c.] intimidation; [d.] stalking; [e.] cyberstalking; [f.] cyberbullying; [g.] physical violence; [h.] sexual violence; [i.] theft; [j.] sexual, religious, or racial harassment; [k.] public humiliation; or [l.] destruction of property. In the bullying context, "harassment" means any threatening, insulting, or dehumanizing gesture . . . or written, verbal or physical conduct directed against a student that: [a.] places a student in reasonable fear of harm to his/her person or damage to his/her property; [b.] has the effect of substantially interfering with a student's educational performance, opportunities, or benefits; or [c.] has the effect of substantially disrupting the orderly operation of a school.

9.    District policy 5517 provides, in pertinent part:

**General Policy Statement**[.] It is the policy of the Board of School Trustees to maintain an education . . . environment that is free from all forms of unlawful harassment . . . occurring in the Corporation's educational opportunities, programs, and/or activities . . . . This commitment applies to all Corporation operations, educational opportunities, programs, and activities. All students, administrators, teachers, staff, and all other school personnel share responsibility for avoiding, discouraging, and reporting any form of unlawful harassment occurring in the Corporation's educational opportunities, programs, and/or activities . . . .

The Board will vigorously enforce its prohibition against unlawful harassment . . . that is based on race, color, national origin, sex . . . religion, disability . . . or . . . classes protected by Federal and/or State civil rights laws . . . and encourages those . . . who feel aggrieved to seek assistance to rectify such problems . . . affecting the Corporation environment.

All Corporation employees, including administrators, professional staff and support staff, shall report any incident of alleged unlawful harassment . . . that the employee observes or which is reported to the employee.

The Corporation will investigate all allegations of unlawful harassment . . . and, in those cases where unlawful harassment is substantiated, will take immediate steps to end the harassment, prevent its recurrence, and remedy its effects.

Individuals who are found to have engaged in unlawful harassment . . . will be subject to appropriate disciplinary action, up to and including termination of employment or expulsion from school.

Furthermore, Corporation employees who fail to report any incident of alleged unlawful harassment . . . that the employee observes or which is reported to the employee also are subject to appropriate disciplinary action, up to and including termination of employment.

10.    District policy 5517.01 provides, in pertinent part:

**Bullying** . . . Bullying behavior toward a student . . . is strictly prohibited and will not be tolerated. This prohibition includes physical, verbal, and psychological abuse as provided herein. The Board will not tolerate any gestures, comments, threats, or actions which cause or threaten to cause bodily harm or personal degradation . . . .

Bullying as defined in State law means overt, unwanted, repeated acts or gestures, including verbal or written communications or images transmitted in any manner (including digitally or electronically), physical acts committed, aggression, or any other behaviors committed by a student or group of students against another student with the intent to harass, ridicule, humiliate, intimidate, or harm the other student and create for the targeted student an objectively hostile school environment that: [a.] places the targeted student in reasonable fear of harm to the targeted student's person or property; [b.] has a substantially detrimental effect on the targeted student's physical or mental health; [c.] has the effect of substantially interfering with the targeted student's academic performance; or [d.] has the effect of substantially interfering with the targeted student's ability to participate in or benefit from the services, activities, and privileges provided by the school.

This type of behavior is a form of harassment, although it need not be based on any of the legally protected characteristics, such as sex, race, color, national origin, marital status, or disability. It includes, but is not limited to, such behaviors as stalking, intimidation, menacing behavior, coercion, name-calling, taunting, making threats, and hazing . . . .

Any student who believes s/he has been or is currently the victim of bullying should immediately report the situation to the building principal or assistant principal or the Superintendent. The student also may report concerns to a teacher or counselor who will be responsible for notifying the appropriate administrator or Board official. This report may be made anonymously . . . . A parent may file a complaint on behalf of a student in the same manner.

Every student is encouraged, and every staff member is required, to report any situation that they believe to be bullying behavior directed toward a student . . . .

All complaints about bullying behavior that may violate this policy shall be promptly investigated according to the timeline established by the Superintendent's administrative guidelines.

If, during an investigation of reported acts of bullying and/or harassment, the investigator believes that the reported misconduct may have created a hostile learning environment and may have constituted unlawful discriminatory harassment based on sex, race, color, national origin, religion, or disability, the investigator will report the act of bullying and/or harassment to one (1) of the Compliance Officers so that it may be investigated in accordance with the procedures set forth in Policy 5517 – Anti-Harassment.

If the investigator finds an instance of bullying behavior has occurred, prompt and appropriate action or responses shall be taken to address the behavior wherever it occurs including, as appropriate, disciplinary action, up to and including expulsion for students . . . . Bullying acts shall be reported to law enforcement officials immediately upon determining that a report to law enforcement is necessary.

The parents of the targeted student and the reported bully shall be notified of the alleged bullying incident at the beginning of the investigation, the findings of the investigation at the conclusion of the investigation, and, as appropriate, any remedial action that has been or will be taken to the extent disclosure is permitted by law. In addition to discipline, remedial action may include support services for the targeted student and bullying education for the bully, among other actions.

### SCHOOL'S HARASSMENT AND BULLYING PRACTICES

11.     While the School's written policies purporting to condemn bullying and other forms of student-on-student harassment appear well-intentioned, unfortunately they are not reflected in the manner that the School addresses, or fails to address, the bullying which occurs in their schools on a regular basis—which supports a reasonable inference that the School either condones such conduct or is deliberately indifferent to its occurrence.

12.     To the extent the School has failed to properly train their employees on the implementation and enforcement of their own written policies, resulting in their employees' ignorance of those policies, this failure constitutes deliberate indifference to T.Y.'s civil rights, specifically including, but not limited to, his right to be educated in an environment which is

harassment-free and not hostile.  The need for school districts to train their employees on such policies is self-evident and obvious.

13.   The School's deliberate or indifferent failure to abide by its own written policies relating to unlawful harassment and bullying has resulted in the deprivation of T.Y.'s civil rights.

14.   The School's failure to take appropriate steps to address bullying under their written policies, and any failure by the School to properly train their employees on the School's written policies, amount to an official policy.

## JURISDICTION

15.   This Court has jurisdiction over Plaintiffs' claims arising under the Constitution or laws of the United States pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367. Plaintiffs have served timely notices of tort claim pursuant to state law.

## VENUE

16.   Venue is in this judicial District pursuant 28 U.S.C. § 1391(b) because the School maintains principal offices in this judicial District and the remaining defendants reside in this District.

17.   The identity of individual employee(s) of the School having final policymaking authority in this area is presently unknown. Once Plaintiffs ascertain the identity of such individuals through discovery, they reserve the right to amend the Complaint to name them as defendants.

## ALLEGATIONS COMMON TO ALL COUNTS

18.   Despite his disability, T.Y. is a smart kid and, naturally, seeks to fit in, be accepted, and liked.  Unfortunately, he was the victim of a lengthy, severe, and pervasive campaign of verbal

and physical harassment by other students at school.  Even more unfortunately, despite having actual knowledge that T.Y. was being bullied and of the significant harmful effects it was having upon T.Y., the School looked the other way and failed to take appropriate measures to prevent or stop the bullying or materially discipline the perpetrators.

19.     The other students' intentional or willful misconduct directed towards T.Y. constitute "unlawful harassment," "disability harassment," and "bullying" as those terms are defined by the School's own written policies, as well as under federal and Indiana law.

20.     At all relevant times, the School had lawful disciplinary authority over the perpetrators because they were students on School's property and the harassment occurred on school property during school hours. Therefore, the School exercised substantial control over the circumstances which led to the harassment and/or the conditions where the harassment was perpetrated.

21.     One of the reasons, and likely the main reason, that T.Y. was targeted for bullying was because he has autism and his related medical conditions. As a result, he is perceived and treated by other students, School employees, and the School as "different."

22.     Upon information and belief, there is a longstanding and systemic bullying problem at the School and the severity of the bullying is worse for students with disabilities than it is for their peers in general education.

23.     The School's widespread custom or practice of allowing bullying in schools has sent a message that students who harass their peers will not face serious consequences. This has fostered a culture of passivity, even tolerance, on the part of School staff which leads students to engage in such conduct because they know they will not face serious reprisals for their actions.

24.     As a result of this institutional tolerance of bullying, T.Y. has been subjected to an ongoing campaign of bullying and harassment on the School's property.

25.     Although bullying of any student is unacceptable, because of his disability, T.Y. belongs to a "protected class" as that term is defined by the School's own written policies and by federal and Indiana law.

26.     In an effort to put a stop to the bullying, both T.Y. and his parents reported the ongoing and repeated harassment of T.Y. to the appropriate School personnel on multiple occasions.

27.     In addition to being teased and called names at school, T.Y. was physically kicked, punched, shoved, and hit by other students.  He was subject to "pantsing," slapped in the face, "tazed" (another student would hit T.Y. in the side of his abdomen), among other incidents.

28.     T.Y. used to love going to school and looked forward to spending time at school every day. However, the relentless campaign of harassment took its toll on T.Y. It damaged his self-esteem and made him feel scared, helpless, and depressed.

29.     The bullying and harassment T.Y. endured was so extreme that it pushed him to the point of attempting to take his own life in the Winter of 2019-2020.  T.Y.'s parents, A.Y. and J.Y., removed T.Y. from school in December 2019 as a result of the detrimental impact the bullying and harassment was having on him.

30.     However, after months of intense therapy, T.Y's love for attending school drove him to try and convince his parents to allow him to return to Haubstadt for the 2020-2021 academic school year, which they ultimately permitted.

31.     The School's teachers and administrators were aware that T.Y. was being bullied but took no action as the bullying escalated and T.Y. suffered further emotional trauma.  The School has known about this situation for years.

32.     T.Y.'s parents had several meetings with school administrators and staff at which they expressed their concerns about T.Y. being bullied. The School employees dismissed the parents' concerns because, according to them, the complained of conduct was T.Y.'s fault.

33.     When the parents complained to School employees about the bullying, the staff, apparently, refused to take them seriously due to the School's inaction. The School failed to take reasonable measures to address the parents' legitimate concerns about the bullying which T.Y. was being forced to endure.

34.     Despite numerous reports that T.Y. was being bullied (made by T.Y. and his parents), the School failed to conduct appropriate investigations into any of the reported incidents and disregarded or discounted T.Y.'s version of events.

35.     Although not an exhaustive list, T.Y.'s parents have communicated with various school administrators and staff directly about the bullying on a number of occasions, including but not limited to:

> a.     An email communication dated July 30, 2020 from A.Y. to Haubstadt Resource Teacher Cassie Helfrich ("Helfrich") requesting that T.Y. not share class periods with certain students;
>
> b.     A telephone conversation between A.Y. and Helfrich on July 31, 2020 wherein A.Y. relayed her concerns regarding T.Y.'s return to Haubstadt for the 2020-2021 school year;

c.      An email communication between A.Y. and Helfrich dated July 31, 2020 wherein Helfrich informed A.Y. that she had forwarded A.Y.'s concerns to Haubstadt Principal John Obermeier ("Obermeier"), and A.Y. explicitly requested T.Y. be kept separate from C.W. and another student during the school day as perpetrators of T.Y.'s continued bullying;

d.      A meeting between A.Y. and Obermeier on or about August 3, 2020 wherein A.Y. informed Obermeier of her concerns regarding reenrollment of T.Y. at Haubstadt as a result of the bullying T.Y. had experienced;

e.      An email communication between A.Y. and Helfrich dated August 9, 2020 wherein A.Y. informed Helfrich that T.Y. would be returning to Haubstadt for the 2020-2021 academic school year and that A.Y. had been informed by Obermeier that T.Y. would share at most the first two (2) periods of the day with C.W.;

f.      A virtual Individualized Education Program ("IEP") meeting for T.Y. between A.Y. and Helfrich on August 24, 2020 wherein A.Y. again voiced her concerns about T.Y. being bullied;

g.      A telephone conversation between A.Y. and Obermeier on or about September 30, 2020 wherein A.Y. informed Obermeier of an altercation between T.Y. and C.W. in their physical education class that the teacher had failed to report to Obermeier;

h.      An email communication between A.Y. and Helfrich dated October 8, 2020 wherein A.Y. informed Helfrich that one of T.Y.'s teammates on his school football team allegedly had been referring to T.Y. as "sped kid" (short for

"special education kid"), contributing to T.Y's anxiety and decision to quit playing on the football team;

i.      An email communication between A.Y. and Helfrich dated October 16, 2020 wherein A.Y. expressed concerns with a School staff member videotaping T.Y. sleeping in class (in part due to his disability), and in such a manner that other students in the class knew the videotaping was occurring and ensured T.Y. was made aware of it after the fact;

j.      An email communication between A.Y. and Helfrich dated March 10, 2021 wherein A.Y. informed Helfrich that parents of students in T.Y.'s class had reached out to A.Y. to tell her how awfully T.Y. was treated by other students at school, and that A.Y. was concerned with the bullying and inconsistent treatment T.Y. was receiving from other students and teachers at Haubstadt; and

k.      A meeting between AY., J.Y., Helfrich, and Obermeier on March 12, 2021 wherein A.Y. expressed her concerns regarding how T.Y. was being treated at by teachers and peers, including name calling and bullying.

36.    Employees of the School (including school administrators with disciplinary authority) knew that T.Y. was being bullied at school, yet they failed to take reasonable measures to prevent it or to stop it from happening. This failure culminated in an incident whereby T.Y. suffered serious and potentially permanent physical, mental, and emotional injuries at Haubstadt.

37.    T.Y. and C.W. attended Haubstadt together as eighth-grade students during the 2020-2021 academic school year. The two have known each other most of their lives.

38.     C.W. was one of the many students that engaged in a pattern of bullying and harassment of T.Y. for many years, including physical, verbal, and mental abuse.  As previously discussed, the School was made aware of C.W.'s bullying of T.Y. and promised A.Y. the School would provide additional monitoring of C.W. and T.Y.'s interactions prior to T.Y.'s enrollment at Haubstadt for the 2020-2021 academic school year.

39.     Despite the School being made aware of T.Y.'s bullying at the hands of C.W. and promises to the contrary, the School made the decision to keep both students in the same homeroom, math, and physical education classes for the spring 2020-2021 school year.

40.     T.Y.'s physical education class at Haubstadt was supervised by District teacher Scott VanMeter ("VanMeter").

41.     On April 28, 2021, while in the physical education class and occupying the gym with other classmates, T.Y. suffered acute mental and physical injuries at the hands of C.W.  C.W. grabbed T.Y. from behind, placing his hands around T.Y.s head and neck, and yanked T.Y. to the ground face-first.

42.     T.Y. was unable to brace himself or put his hands up to otherwise shield himself from the gymnasium floor impact. T.Y.'s face and head were slammed into the hard gymnasium floor.

43.     After slamming T.Y to the ground, C.W. simply returned to his volleyball game.

44.     T.Y. lost consciousness, his nose was bleeding as a result of his face's impact with the gymnasium floor, he could see blood entering his eye balls, and he could see his nose now with his left eye wherein he could not do so before the day's traumatic events.  T.Y. eventually got back to his feet, left the gymnasium, and walked himself to the Haubstadt school nurse's office.

45.     All the while, VanMeter had left the gymnasium frequently throughout T.Y. and C.W.'s physical education class period that day.  His habit was to regularly be absent from the class and fail to monitor the students.

46.     Moreover, of the time VanMeter actually was present in the gymnasium during said physical education period, he spent a significant amount of time on his cell phone.

47.     VanMeter hardly, if at all, paid any attention to the students or the class on April 28, 2021 prior to the T.Y.'s injury.

48.     In fact, he witnessed none of the events between C.W. and T.Y. that day because he was not present in the gymnasium when they occurred. VanMeter was not aware of the attack on T.Y. by C.W. until he re-entered the gymnasium and was informed of it by another student. T.Y. had already left the gymnasium by this point in time.

49.     Despite being informed of the violent altercation, VanMeter did not remove C.W. from the physical education class or even the volleyball game. Fortunately, VanMeter did clean the remainder of T.Y.'s blood from the gymnasium floor.

50.     The Haubstadt school nurse contacted A.Y. to inform her that T.Y. had been in an incident in his physical education class, that he had received a laceration, and that T.Y. should probably receive a medical examination. The nurse neither informed A.Y. of the magnitude of T.Y's injuries nor mentioned the nature of the incident or that another student had been involved.

51.     When A.Y. arrived at Haubstadt on April 28, 2021, she discovered T.Y. sitting alone in the nurse's restroom, bleeding from the bridge of his nose and both nostrils. A.Y. removed T.Y. from Haubstadt and took him for medical assessment and treatment.

52.     T.Y. suffered physical injuries including but not limited to, a broken nose requiring stitches and surgery, a skull fracture, and a concussion.

53.     Before leaving Haubstadt, A.Y. spoke with the police officer stationed at Haubstadt.  He informed A.Y. that he had seen video footage of the incident, that T.Y. was "blind-sided," and if C.W. was an adult he would be facing a Level 5 Felony.

54.     VanMeter finished the 2020-2021 academic school year as Haubstadt's physical education teacher but did not return as the Haubstadt physical education teacher for the 2021-2022 academic school year.

55.     While A.Y. was obtaining medical treatment for T.Y., Principal Obermeier contacted A.Y. and informed her that the student responsible for T.Y.'s injuries would receive a two-day suspension, that the School was not responsible for the injury or T.Y.'s medical expenses, and that A.Y. could file a lawsuit against C.W. and/or his parents if she wished.

56.     Later that same day, A.Y. emailed Obermeier questioning how the length of suspension for a student is determined, when expulsion is warranted, and whether there is a standard procedure in place for making such a determination.

57.     Obermeier and A.Y. had a phone conversation the following day, April 29, 2021, wherein Obermeier informed A.Y. that the C.W.'s suspension had been extended to ten (10) days and that he would be recommending expulsion for C.W., subject to an upcoming hearing. Obermeier told A.Y. that he would let her know the date of the hearing once he had confirmed.

58.     On May 5, 2021, A.Y. emailed Obermeier following up on C.W.'s status and when the hearing on his expulsion would occur.  Obermeier responded the following day stating "[n]othing has changed this week. A decision may be made next week."

59.     Five days later, A.Y. again followed up with Obermeier asking if there would be a hearing on C.W.'s potential expulsion and whether attendance would be allowed.  Obermeier

15

responded by stating "[t]he hearing is more of a meeting than a hearing. I am sorry, but you are not able to attend."

60.     On Thursday, May 13, 2021, A.Y. received a disturbing phone call from T.Y., who was in tears and in the midst of a panic attack in a Haubstadt school restroom, informing her that he just discovered C.W. would be returning to school the following day, Friday, May 14, 2021.

61.     A.Y. immediately contacted the School and informed them that May 13, 2021 would be T.Y.'s last day at Haubstadt and requested his belongings be packed and ready to go prior to T.Y.'s therapy appointment scheduled for later that day.

62.     A.Y. was presented with disenrollment forms upon her arrival at Haubstadt. However, Obermeier convinced A.Y. to pause T.Y.'s disenrollment so T.Y. could attend his eighth-grade graduation. At the School's request, A.Y. agreed to a leave of absence for T.Y in lieu of disenrollment.

63.     During this meeting between A.Y. and Obermeier, Obermeier pressured A.Y. to make decisions about T.Y.'s future that she was not prepared to make. A.Y. refused to make any further on-the-spot decisions regarding T.Y.'s future and eventually left Haubstadt distraught and in tears.

64.     A.Y. had attempted to contact School Superintendent Dr. Stacey Humbaugh ("Dr. Humbaugh") on several occasions after the April 28, 2021 incident between T.Y. and C.W. to no avail. However, after A.Y.'s meeting with Obermeier on May 13, 2021, A.Y. once again reached out to Dr. Humbaugh and her call was finally taken. Dr. Humbaugh told A.Y. that she was aware of the situation; that the School's decision relating to C.W. was final and A.Y. had no right to an appeal; that it was in A.Y.'s best interest to "move on" and "let it go;" and that Dr. Humbaugh could not talk about the incident with A.Y. any further. During this conversation, Dr. Humbaugh

neither expressed any concern or empathy for T.Y.'s well-being nor did she inquire as to how T.Y. was doing.

65.     In fact, at no point did Dr. Humbaugh, any School board member, or any attorney for the School contact A.Y. regarding the incident between T.Y. and C.W. on April 28, 2021.

66.     C.W.'s parents sent A.Y. a single text message apologizing, stating the incident between C.W. and T.Y. was unacceptable, and hoping that T.Y. was okay. A.Y. did not hear from C.W.'s parents again regarding the April 28, 2021 incident.

67.     A.Y. attempted to contact the local county prosecutor on three (3) separate occasions to inquire about the possibility of criminal charges being filed against C.W. None of A.Y.'s phone calls were returned.

68.     In addition to the bullying causing or exacerbating T.Y.'s symptoms of depression, T.Y. developed a school-based anxiety disorder as a result of the harassment which he experienced at school.

69.     As previously indicated, the School routinely blamed T.Y. for any instances involving bullying rather than addressing the situation with T.Y. as the victim.

70.     This cavalier and dismissive attitude was typical of the School's response to the bullying of T.Y. which was occurring—and being reported to the School—on a regular basis.

71.     Notwithstanding the violent behavior of C.W. and potentially permanent injuries suffered by T.Y., the School refused to expel C.W, and in fact, upon information and belief, allowed C.W. to graduate from eighth grade with honors.  T.Y., A.Y., and J.Y. made the difficult decision not to send T.Y. back to Haubstadt out of fear for his physical and emotional well-being. However, despite T.Y.'s election to not return to Haubstadt, he continues to endure pain and suffering as a result of the bullying and harassment he suffered there.

72.     The ongoing bullying which T.Y. experienced at school was so pervasive and severe that it created a hostile and unsafe environment and instilled in T.Y. a fear of going to school.

73.     The bullying was more than isolated or sporadic incidents; it was serious, ongoing and continuous and had the systemic effect of denying T.Y. a harassment- and discrimination-free educational environment.

74.     The School had actual knowledge that harassment of T.Y. based on his disability was so severe and pervasive that it created a hostile environment that deprived T.Y. of access to their educational programs, activities, and opportunities entirely.

75.     The School's deliberate indifference to the harassment of T.Y. was demonstrated by its actions and inaction, which were clearly unreasonable in light of the known circumstances and resulted in serious physical, mental, and emotional injuries to T.Y.

76.     T.Y. has the right to attend school in an environment free from hostility towards persons with disabilities, and free from hostility in general. The hostile environment which he experienced at the School's locations deprived him of educational opportunities and benefits entirely.

77.     The School has had high profile reports of bullying in the past, including incidents involving weapons at its schools. *See, e.g.*, https://www.14news.com/story/28804262/gibson-county-mother-upset-by-bullying-in-school/.  According to the mother of a bullied student in that case, she wanted to shed light on an incident of bullying involving her son to help "give other students the courage to fight against bullying . . . [a]nd not just in Owensville but with the South Gibson School Corporation."

78.     Despite the gravity of the attack on T.Y., and reports provided to the School by T.Y., A.Y., and law enforcement, according to the Indiana Department of Education's "Indiana Schools Safety Staffing, Arrests, and Bullying Report 2020-2021" and corresponding data, the School reported four (4) total incidents of bullying in its schools during the 2020-2021 academic year, including only a single incident of written communication/electronic bullying at Haubstadt. The School is required to report all instances of bullying under Indiana law but did not report T.Y's suffering as bullying to the State of Indiana, unless it somehow categorized it as "written communication/electronic bullying."

79.     As a result of bullying and harassment allowed and tolerated by the School, which it has failed to take seriously or even report, T.Y. has suffered the following conditions: nightmares, irritability, emotional trauma, lack of sleep, anxiety, increased professional therapy, new or additional medications, eating disorders, general pain and suffering, broken bones, a collapsed nose bridge, stitches, and surgical intervention, among others.

80.     T.Y. attempted to return to school for the 2021-2022 academic school year at Gibson Southern, the high school operated by the School, but was once again been forced to withdraw as a result of the pervasive and systemic bullying he was suffering there as well.

81.     During the fall semester of the 2021-2022 academic school year, T.Y. endured continued extensive and severe bullying from other students at Gibson Southern, including but not limited to:

    a.     A student in T.Y.'s physical education class telling T.Y. that he "titty f***** his mom" and threatening to go to T.Y.'s house to murder T.Y. and his entire family;

b.      A student in T.Y.'s physical education class telling T.Y. he was going have sex with T.Y.'s younger sister, an eight-year-old girl;

c.      Gibson Southern Assistant Principal, after meeting with all parties involved in the events of the preceding two (2) paragraphs, stating she did not feel this behavior constituted bullying unless the behavior continued;

d.      Students in T.Y.'s biology class yelling "sped" when T.Y. entered the classroom and yelling "your mom" or "you're gay" when T.Y. would try to speak, with T.Y.'s biology teacher present in the classroom and doing nothing to intervene or otherwise address the behavior directed towards T.Y.;

e.      A student or students texting T.Y. from a fake cell phone number pretending to be a female interested in T.Y. (a/k/a catfishing) and sharing the conversation with other students at school solely to humiliate T.Y.;

f.      T.Y. being threatened and continuously called names when he returned to Gibson Southern after the catfishing (A.Y. kept T.Y. home for a time due to fears of escalation and retaliation against T.Y.); and

g.      A student telling T.Y. that his mother, A.Y., was a "c***" and that "she [A.Y.] couldn't protect him [T.Y.] forever."

82.     On December 16, 2021, A.Y. and J.Y. decided to withdrawal T.Y. from Gibson Southern to remove him from the hostile environment created or permitted by the School.

83.     The pervasive issues involving harassment, bullying, intimidation, and discrimination by students against T.Y., and the School's tolerant, if not protectionist, attitude and actions or inaction towards the perpetrators of said bullying and discrimination, extend beyond the

confines Haubstadt to the District as a whole, resulting in deprivation of T.Y.'s, right to obtain an education in a discrimination- and harassment-free environment.

## COUNT I
## SECTION 504 OF THE REHABILITATION ACT (SCHOOL)

84.     Plaintiffs incorporate by reference their prior allegations as if fully set forth herein.

85.     This claim is brought pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("Section 504") and its implementing regulations, 34 C.F.R. § 104 *et seq.*

86.     The School receives federal financial assistance and is a "recipient" as defined under 34 C.F.R. § 104.3.

87.     The School operates a "program or activity" as defined by 29 U.S.C. § 794(b) as the School is a local educational agency and is principally engaged in the provision of educational services.

88.     T.Y.'s condition substantially limits one or more major life activities and poses a substantial impediment to his education. He is an "individual with a disability" as defined by 29 U.S.C. § 705 and a "qualified handicapped person" as defined by 34 C.F.R. § 104.3.

89.     Section 504 guarantees T.Y. the right to participate, along with nondisabled students, in the School's academic, nonacademic and extracurricular activities (e.g., lunch, recess, recreational activities) and services to the maximum extent appropriate to his needs. 34 C.F.R. § 104.34(a), (b).

90.     The School operated its program or activity on the basis of generalizations, assumptions, prejudices, or stereotypes about T.Y.'s disability and how it affects him.

91.     Students' bullying of T.Y. constitutes harassment on the basis of his disability, which interfered with his right to receive an education in an environment free from discrimination and harassment.

92.     The School knew, or was deliberately indifferent to knowing, that T.Y. was being harassed on the basis of his disability yet failed to take proper steps to investigate or otherwise determine what occurred.

93.     The School knew, or was deliberately indifferent to knowing, that T.Y. was being subjected to discriminatory harassment which created a hostile environment sufficiently serious to interfere with or limit T.Y.'s ability to participate in or benefit from the School's programs or activities generally.

94.     Despite this knowledge, the School failed to take prompt and effective steps to end the harassment, eliminate the hostile environment, prevent its recurrence, or remedy its effects.

95.     By allowing the hostile educational environment to exist at school, the School discriminated against T.Y. because of his disability. Non-disabled persons receive the benefits or services for which T.Y. is otherwise qualified, but T.Y., solely by reason of his disability, was excluded from, denied participation in, or denied the benefits of attending school by the School or was otherwise subjected to discrimination by the School.

96.     The School acted with discriminatory intent or deliberate indifference towards T.Y.

97.     The School subjected him to a hostile educational environment on the basis of his disability and thus deprived him of the opportunity to participate, along with nondisabled students, in the School's academic, nonacademic and extracurricular activities in violation of 34 C.F.R. § 104.34.

98.     As a result of the School's discrimination, T.Y. has been excluded from participation in, denied him the benefits of, or otherwise subjected to discrimination under a program or activity which receives federal financial assistance in violation of 29 U.S.C. § 794(a).

## COUNT II
## AMERICANS WITH DISABILITIES ACT (SCHOOL)

99.     Plaintiffs incorporate by reference their prior allegations as if fully set forth herein.

100.     This claim is brought pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 (the "ADA") and its implementing regulations, 34 C.F.R. Part 35.

101.     Under 42 U.S.C. § 12132, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

102.     The District and Board are "public entities" as defined by 42 U.S.C. § 12131(1).

103.     T.Y. is a "qualified individual with a disability" as defined by 42 U.S.C. § 12131(2).

104.     By reason of T.Y.'s disability, the School excluded him from participation in or denied him the benefits of the services, programs or activities of a public entity or subjected T.Y. to discrimination. Specifically, by failing to take reasonable measures to address the continued bullying endured by T.Y., the School subjected T.Y. to a hostile environment at school on the basis of his disability.

105.     The School acted with discriminatory intent or deliberate indifference towards T.Y.

106.     The School's actions and inaction violate Title II of the ADA.

## COUNT III
## EQUAL PROTECTION (SCHOOL)

107.     Plaintiffs incorporate their prior allegations as if fully set forth herein.

108.     T.Y. belongs to a protected class by reason of his disability. He is entitled to attend school in an environment which is not hostile; however, he was repeatedly harassed by other students, in whole or in part, because of his disability. This harassment created a hostile environment at school and deprived T.Y. of educational opportunities and benefits.

109.    The School had actual knowledge that T.Y. was being bullied but turned a blind eye and the failure to act in the face of such knowledge demonstrates deliberate indifference toward T.Y.'s predicament.

110.    The School knew or should have known that failing to take reasonable measures to prevent T.Y. from being subjected to harassment violated his equal protection rights.

111.    The School's inaction and failure to take meaningful steps to address student on student harassment in its schools represents a widespread custom or practice.

112.    The School's custom and practice of ignoring the harassment of students (particularly disabled students) in is so well-settled that it amounts to a policy which is unconstitutional. As a result of unconstitutional custom, practice, or *de facto* policy, T.Y.'s constitutional rights were violated.

113.    Pursuant to custom, practice or *de facto* policy of ignoring student on student harassment, the School subjected T.Y. to multiple instances of discrimination because of his disability. Nondisabled students were not subjected to the same treatment as T.Y.

114.    There is no rational basis or legitimate state interest to justify the School's inaction in the face of numerous reports that T.Y. was being bullied.

115.    Whether the School adopted a policy or engaged in a custom or practice which amounts to a policy, its actions (or inaction) in the face of the ongoing, repeated, and severe harassment of T.Y. lacks any rational relationship with a legitimate government interest.

116.    The School acted with discriminatory intent or deliberate indifference towards T.Y.

117.    The School, acting under color of state law, discriminated against T.Y. because of his disability by allowing a hostile environment to exist at school. Such discrimination deprived

T.Y. of the equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution.

## COUNT IV
## NEGLIGENCE AND NEGLIGENCE PER SE (SCHOOL)

118.    Plaintiffs incorporate by reference their prior allegations as if fully set forth herein.

119.    At all relevant times, T.Y. was lawfully upon the premises of the School.

120.    The School owed T.Y., A.Y., and J.Y. common law and statutory duties of reasonable care and supervision of students.

121.    The School owed T.Y. a duty to protect him from the reasonably foreseeable actions of others.

122.    The School breached these duties.

123.    There is a history of student-on-student bullying at schools operated by the School, including Haubstadt, which T.Y. attended.

124.    The School knew or should have known the nature and extent of the bullying which was occurring in the schools it operates and controls.

125.    There is a history of student-on-student bullying involving C.W. and T.Y. that was known to the School.

126.    The School knew or should have known that T.Y. was being subjected to harassment and bullying by other students at Haubstadt, specifically including C.W. The students who harassed T.Y. were subject to the School's disciplinary authority.

127.    The School failed to take reasonable measures to prevent T.Y. from being subjected to bullying when he was at school or school-sponsored activities. This failure directly and proximately increased the risk of harm to T.Y. and includes failing to adequately supervise students in their charge; failing to devise, implement, and enforce appropriate anti-bullying

policies and procedures; failing to intervene when students are bullied; failing to properly investigate reports of bullying; and failing to take appropriate disciplinary action against the perpetrators.

128.    As a direct and proximate result of the School's negligence, Plaintiffs have sustained damages, including pain and suffering. Specifically, T.Y. suffered physical injuries and emotional distress and A.Y. and J.Y. incurred medical expenses on behalf of T.Y.

129.    The School's negligence, failure to investigate the harassment of T.Y., failure to adequately supervise its students, and failure to take disciplinary action against the perpetrators created a hostile environment at school, made T.Y. more vulnerable to harassment at school, and/or caused T.Y. to be subjected to harassment.

130.    To the extent the School violated federal and state statutes and such statutory violations proximately caused or contributed to harm T.Y., the School is liable for negligence *per se*.

131.    The School's negligent acts or omissions caused T.Y. personal injury and emotional distress.

## COUNT V
## BATTERY (PERPETRATOR AND PARENTS)

132.    Plaintiffs incorporate their prior allegations as if fully set forth herein.

133.    The intentional actions of C.W. on April 28, 2021 constitute battery.

134.    C.W.'s parents failed to exercise control over C.W. when they knew or with due care should have known that injury to T.Y. was possible.

135.    C.W.'s actions were done knowingly, intentionally, or recklessly and caused harm to T.Y.

136.     C.W.'s conduct was willful and wanton, and he acted knowingly with conscious and intentional misconduct that had a high probability of causing injury.

## COUNT VI
## NEGLIGENCE (PERPETRATOR AND PARENTS)

137.     Plaintiffs incorporate their prior allegations as if fully set forth herein.

138.     C.W. owed T.Y. a duty not to take actions or inactions to place him in, or cause him, harm.

139.     C.W. breached that duty.

140.     C.W.'s actions directly caused T.Y. damages and injuries.

141.     C.W.'s actions proximately caused T.Y. damages and injuries.

142.     C.W.'s parents failed to exercise control over C.W. when they knew or with due care should have known that injury to T.Y. was possible.

143.     C.W.'s actions were done knowingly, intentionally, or recklessly and caused harm to T.Y.

## PRAYER FOR RELIEF AND DEMAND FOR JUDGMENT

Plaintiffs request the following relief:

   a.     Judgment in their favor and against the School, jointly and severally, including, but not limited to, compensatory damages, punitive damages, and costs pursuant to applicable state and federal law;

   b.     Judgment in their favor and against C.W. and his parents, jointly and severally, including, but not limited to, compensatory damages, costs, and any punitive/special/treble damages available pursuant to I.C. § 34-24-3-1 or other applicable law;

27

c. Reasonable attorney fees pursuant to 29 U.S.C. § 794a(b), 42 U.S.C. § 12205, and 42 U.S.C. § 1988(b), or I.C. § 34-24-3-1; and

d. All other relief reasonable in the premises.

Dated:  January 28, 2022

Respectfully Submitted,
T.Y., A.Y., and J.Y.
*By Counsel*


STOLL KEENON OGDEN PLLC


By: *_/s/ Joseph H. Langerak_*


Joseph H. Langerak IV
Jordan M. Saner
STOLL KEENON OGDEN PLLC
One Main Street, Suite 201
Evansville, Indiana 47708
(812) 425-1591 (ph)
(812) 421-4936 (fax)
joe.langerak@skofirm.com
jordan.saner@skofirm.com